1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

10   ANDRES CONTRERAS,                          1:10-CV-02390 OWW SMS HC

11                          Petitioner,          FINDINGS AND RECOMMENDATION
                                                 REGARDING PETITION FOR WRIT OF
12          v.                                   HABEAS CORPUS

13   K. HARRINGTON,

14                          Respondent.

15   _____/

16
17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

                        **PROCEDURAL BACKGROUND**[1]

19
20          Petitioner is currently in the custody of the California Department of Corrections pursuant to

21   a judgment of the Superior Court of California, County of Tulare, following his conviction by jury

22   trial on October 23, 2006, of: one count of first degree murder (Cal. Penal Code [2] § 187(a)); two

     counts of attempted first degree murder (§§ 187, 664); one count of permitting another to shoot from

23   a vehicle (§ 12034(b)); one count of discharging a firearm from a vehicle (§ 12034(c)); and one

24   count of shooting at an inhabited dwelling (§ 186.22(b)(1)).  Gang and firearm enhancements were

25
26   _____

27          [1]This information is derived from the pleadings in this case and the state court records lodged by Respondent with
     his response.

28          [2]All further statutory references are to the California Penal Code unless otherwise noted.

1  found to be true.  On November 22, 2006, he was sentenced to life without the possibility of parole

2  plus an additional term of 25 years to life.

3      Petitioner appealed to the California Court of Appeals, Fifth Appellate District (hereinafter

4  "Fifth DCA").  Petitioner claimed, *inter alia*, that the trial court failed to recognize it had the

5  discretion to sentence Petitioner to 25 years to life rather than life without the possibility of parole.

6  On December 27, 2007, the Fifth DCA vacated the life without parole sentence and remanded the

7  matter to the trial court for resentencing.  The judgment was otherwise affirmed.  On January 29,

8  2008, Petitioner filed a petition for review.  On April 9, 2008, the petition was denied.

9      On June 8, 2009, Petitioner filed a federal petition for writ of habeas corpus in this Court, in

10 which he claimed ineffective assistance of counsel.  See Contreras v. Haws, Case No. 1:09-CV-0994

11 OWW DLB HC.  On January 13, 2010, the petition was denied on the merits.

12     On August 28, 2008, the Tulare County Superior Court resentenced Petitioner, again to a

13 term of life without the possibility of parole plus 25 years to life.  Petitioner again appealed to the

14 Fifth DCA whereupon judgment was affirmed in a reasoned decision on August 17, 2009.  Petitioner

15 then petitioned for review in the California Supreme Court.  The petition was summarily denied on

16 October 23, 2009.

17     Petitioner filed the instant federal habeas petition in this Court on December 27, 2010.  He

18 claims his sentence constitutes cruel and unusual punishment under the Eighth Amendment to the

19 Constitution.  On June 22, 2011, Respondent filed an answer to the petition.  Petitioner did not file a

20 traverse.

21                    **FACTUAL BACKGROUND**[3]

22      On March 26, 2005, Alejandro Gonzales reported that his white Honda four-door car
   had been stolen.

23
24      Pedro Flores was standing outside of his home on Easter morning, March 27, 2005. A
   white car with two Hispanic male occupants drove by. The occupants of the car stared at
   Flores. Flores "flipped them off" and made a Northerner gang sign. The car turned around
25 and one of the occupants fired shots at Flores. Flores later told an officer that the driver was
   the shooter. Flores ran inside and relocated his sister from the front bedroom to the rear
26 bedroom. More shots were fired into the front bedroom. Flores testified that the passenger

27 ─────────────────────

28    [3]The factual background is taken from the opinion of the state appellate court and is presumed correct. 28
   U.S.C. § 2254(e)(1).

1    was the person who was shooting after Flores went inside his home. Flores described the
     driver as skinny and the passenger as heavier. A handgun was used.
2

3         J.B., an 11-year-old neighbor of Flores, testified he was playing in the backyard on
     Easter morning. He heard gunshots and ran to a window and looked out. Flores was calling
4    out names to the males in a four-door white car. The car contained two males in the front
     seat. Flores went inside his home. The car turned around and the passenger started shooting a
5    rifle.

6         Later that same Easter morning, V. was with his older brother, Anthony Castro
     (Castro). They went to a gas station to put gas in their mother's car. A white Honda drove by
7    and the passenger flashed a Southerner gang sign at them. V. and Castro ignored the incident.
     The driver of the white Honda stopped at the gas station and put gas in the car. V. said the
8    driver was skinny. Castro and V. left the gas station and the white Honda followed them.

9         Castro then drove to pick up his good friend Alejandro Salazar, a Norteno gang
     member. Castro was still being followed by a white Honda with two males inside. The Honda
10   continued to follow them after Castro picked up Salazar. Castro returned to his house and
     dropped off V. Castro changed his clothes and then he and Salazar began walking back to
11   Salazar's house.

12        As Castro and Salazar were walking back toward Salazar's house, the white Honda
     drove in their direction. A rifle came out of the back seat window and shots were fired.
13   Salazar fell to the ground, then got up and ran to his house. Castro ran into a different house.

14        V. was outside of his house when his cousin Sandra came and said that Castro had
     been shot. V. saw the white Honda speeding away from the area. Castro had been shot three
15   times. He bled to death from the gunshot wound to his back. This bullet passed through his
     liver, kidney, diaphragm and heart. He had two other bullet wounds, one to his leg and one to
16   his hip.

17        Salazar's aunt took Salazar to the hospital. He had been shot three times, once each to
     the head, back and leg.

18        On Easter evening, law enforcement received a call reporting the location of a stolen
19   vehicle. Deputy Sheriff William Hakker went to the location. He saw a white Honda with a
     Hispanic male in the driver's seat. The male ran into an apartment. Defendant came out of the
20   same apartment; he was not the male who ran inside the apartment. The white Honda
     matched the description of a vehicle used earlier in a shooting. The vehicle contained a .22
21   rifle and a 12-gauge shotgun.

22        Defendant was questioned. At first, defendant denied all involvement in the
     shootings. He then admitted that during the first shooting he shot at the window of the house.
23   In the second shooting, defendant was driving when Ezekial Perez shot at the two males
     walking down the street. Defendant said that earlier that morning he went to Kmart with
24   Ezekial and gave him money to buy ammunition. Ezekial bought the ammunition.

25        On Easter morning, March 27, 2005, two bald, "gangster-type" males came into the
     Delano Kmart and purchased a box of .22-caliber ammunition. An employee of the store
26   identified Ezekial Perez from a picture as the "chubby" person who walked out of the store
     with a bag of ammunition.

27        Stephen Pederson testified as an expert on gangs. He testified that defendant was a
     gang member and the crimes were committed for the benefit of a criminal street gang.

28

1  (See Resp't's Lodged Doc. 10.)

2  **DISCUSSION**

3  I.      Jurisdiction

4        Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

5  to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

6  the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

7  375, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S.

8  Constitution.  The challenged conviction arises out of Tulare County Superior Court, which is

9  located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

10        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

11  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

12  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), cert.

13  denied, 522 U.S. 1008 (1997), quoting, Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert.

14  denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh, 521 U.S. 320 (holding AEDPA

15  only applicable to cases filed after statute's enactment).  The instant petition was filed after the

16  enactment of the AEDPA and is therefore governed by its provisions.

17  II.     Standard of Review

18        The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death

19  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade, 538 U.S. 63, 70

20  (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's

21  adjudication of his claim:

22        (1) resulted in a decision that was contrary to, or involved an unreasonable application
23        of, clearly established Federal law, as determined by the Supreme Court of the United
       States; or

24        (2) resulted in a decision that was based on an unreasonable determination of the facts
       in light of the evidence presented in the State court proceeding.
25

26  28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

27        As a threshold matter, this Court must "first decide what constitutes 'clearly established

28  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

*quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  Id., *quoting* Williams, 592 U.S. at 412; see also Harrington v. Richter, __ U.S. __, 131 S.Ct. 770, 785 (2011). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer, 538 U.S. at 71.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting*, 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Harrington, 131 S.Ct. at 785.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Williams, 529 U.S. at 409.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 131 S.Ct. at 786, *quoting*, Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Further, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." Knowles v. Mirzayance, 556 U.S. 111, __, 129 S.Ct. 1411, 1419 (2009).  "Under 2254(d), a habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree

1   that those arguments or theories are inconsistent with the holding of a prior decision of [the

2   Supreme] Court." Harrington, 131 S.Ct. at 786.  Only "where there is no possibility fairminded

3   jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents"

4   may the writ issue. Id.

5        Petitioner has the burden of establishing that the decision of the state court is contrary to or

6   involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,

7   94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,

8   Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court

9   decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th

10   Cir.1999).

11        AEDPA requires that we give considerable deference to state court decisions. "Factual

12   determinations by state courts are presumed correct absent clear and convincing evidence to the

13   contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

14   factual determination will not be overturned on factual grounds unless objectively unreasonable in

15   light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell,

16   537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of

17   historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943,

18   976-77 (2004).

19   III.    Review of Claim

20        Petitioner contends his sentence to life without the possibility of parole constitutes cruel and

21   unusual punishment under the Eighth Amendment.  He states he was sixteen years old at the time of

22   the offense, admitted his participation in the shooting, and had used drugs and alcohol at a young

23   age.  He contends the sentence he received given his young age was grossly disproportionate.

24   Respondent argues the state court reasonably rejected Petitioner's claim.

25        This claim was presented on direct appeal to the Fifth DCA where it was rejected in a

26   reasoned decision.  Petitioner then presented the claim in a petition for review to the California

27   Supreme Court where it was summarily rejected.  When the California Supreme Court's opinion is

28   summary in nature, the Court must "look through" that decision to the court below that has issued a

1   reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the

2   appellate decision was the last reasoned decision.  The appellate court denied the claim as follows:

3           "Cruel and unusual punishment is prohibited by the Eighth Amendment to the United
        States Constitution and article I, section 17 of the California Constitution. Punishment is
4       cruel and unusual if it is so disproportionate to the crime committed that it shocks the
        conscience and offends fundamental notions of human dignity." (*People v. Mantanez* (2002)
5       98 Cal.App.4th 354, 358, fns. omitted.)

6           In *Roper v. Simmons* (2005) 543 U.S. 551, the United States Supreme Court found
        that the imposition of the death penalty for juvenile offenders constituted cruel and unusual
7       punishment. The earlier case of *Thompson v. Oklahoma* (1988) 487 U.S. 815 held that
        juveniles under the age of 16 could not be subject to the death penalty. In *Atkins v. Virginia*
8       (2002) 536 U.S. 304 it was held that the death penalty cannot be imposed on mentally
        retarded persons. In all three cases a clear distinction was made between execution and lesser
9       sanctions. "Justice O'Connor's concurring opinion in *Thompson,* in which she cast the fifth
        and decisive vote for the judgment in that case, pointed out the significance of the distinction:
10      'The Court has accordingly imposed a series of unique substantive and procedural restrictions
        designed to ensure that capital punishment is not imposed without the serious and calm
11      reflection that ought to precede any decision of such gravity and finality.' [Citation.]"
        (*People v. Demirdjian* (2006) 144 Cal.App.4th 10, 14.) "Because the death penalty is the
12      most severe punishment, the Eighth Amendment applies to it with special force." ( *Roper v.
        Simmons, supra,* at p. 568.)

13          Although *Roper v. Simmons* points out that youth are more impetuous, are more
14      vulnerable or susceptible to negative and outside pressures, and the personality traits of a
        juvenile are less fixed and more transitory (543 U.S. at pp. 569-570), we have not been
15      provided any California or United States Supreme Court authority holding that lengthy
        sentences are per se excessive in all cases involving juveniles. (*People v. Demirdjian, supra,*
16      144 Cal.App.4th at p. 15.)

17          Characteristics found in juvenile offenders are, however, still relevant to an inquiry
        regarding cruel and unusual punishment, as demonstrated by the California case of *People v.*
18      *Dillon* (1983) 34 Cal.4th 441, a case relied on heavily by defendant here. In *Dillon,* a 17-
        year-old juvenile planned with other juveniles to steal marijuana from a nearby field. During
19      their first attempt they were discovered and sent away by the field's owner with threats they
        would be shot if they returned. The group devised another plan and returned to the field; this
20      time they were armed with shotguns. One of the youths accidently discharged his gun. Dillon
        thought his friends were being shot and he became very frightened. The owner of the field,
21      armed with a shotgun, circled around the group and approached. Dillon saw the owner and
        was sure the owner saw him. The owner shifted his gun so it was pointed in the defendant's
22      direction. Dillon was terrified that he was about to be shot. Dillon lowered his gun and began
        firing. When the owner of the field fell to the ground, Dillon stopped firing. The owner died
23      after having been hit nine times. (*Id.* at pp. 482-483.)

24          Dillon had no prior record, and at trial expert testimony was presented showing that
        Dillon was very immature, even for a youth his age. Dillon was tried for first degree murder
25      under a theory of felony murder. Both the jury and the trial court made it clear they felt a first
        degree murder conviction was too harsh based on the circumstances of the crime and Dillon's
26      background, but Dillon was convicted of first degree murder based on the facts and was sent
        to prison for life. (*People v. Dillon, supra,* 34 Cal.4th at p. 484 .)

27
28          The California Supreme Court modified the conviction of first degree murder to
        second degree murder, finding that Dillon's punishment was cruel and unusual under the

California Constitution. The court noted that the other participants in the crime received relatively "petty chastisements" (*People v. Dillon, supra,* 34 Cal.4th at p. 488) and further noted the harshness of the felony murder rule (*id.* at pp. 486-489).

The finding of cruel and unusual punishment in *Dillon* was based primarily on the first criteria out of three utilized to determine if a punishment is cruel and unusual. The first test is one of intracase proportionality, and we examine "'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society.'" (*People v. Dillon, supra,* 34 Cal.3d at p. 479.) This examination requires us to look at the entire circumstances of the crime-including motive, method, and results-and also requires us to look at the characteristics of the defendant-including his age, prior criminality, personal characteristics, and state of mind. (*Ibid.*)

While defendant here was young and had a minor prior record of criminality, he is not similar in any other respect to the defendant in *Dillon.* The victims of the murder and other crimes in this case did not do anything to provoke defendant's deadly attack. Defendant directly participated in two drive-by shootings on the same day, killing one victim and seriously injuring another. Defendant was a gang member and participated in the crime for the benefit of a criminal street gang. "The fact that defendant ... had chosen to embrace an antisocial, savage, gang lifestyle of complete heinousness, callousness and utter disregard for the law or for the rights of others at a relatively early age does not demonstrate the disproportionality of the sentence. The senselessness of defendant['s] ... crimes makes them more, rather than less, deserving of punishment." (*People v. Guinn, supra,* 28 Cal.App.4th at pp. 1146.)

Defendant does not discuss the second test of the tripartite test for cruel and unusual punishment-a comparison of the challenged penalty with those imposed in the same jurisdiction for more serious crimes-nor does he discuss the third part of the test-comparing the challenged penalty with those imposed for the same offense in other jurisdictions. (*People v. Chacon* (1995) 37 Cal.App.4th 52, 63.)

Finally, defendant claims we should be guided by the evolving international human rights standards regarding the punishment and treatment of young offenders. "'Defining crime and determining punishment' are matters uniquely legislative in nature, resting within the Legislature's sole discretion.' [Citation.]" (*People v. Lewis* (1993) 21 Cal.App.4th 243, 251.) "'Our Supreme Court has emphasized "the considerable burden a defendant must overcome in challenging a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California, and a court should not lightly encroach on matters which are uniquely in the domain of the Legislature. Perhaps foremost among these are the definition of crime and the determination of punishment. While these intrinsically legislative functions are circumscribed by the constitutional limits of article I, section 17 [of the California Constitution], the validity of enactments will not be questioned 'unless their constitutionality clearly, positively and unmistakably appears."'" [Citation.]" (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 569, brackets in original.)

Based on the tests that we are required to apply, we find that defendant has failed to show that his sentence offends the proscription against cruel and unusual punishment.

(See Resp't's Lodged Doc. 10.)

A criminal sentence that is not proportionate to the crime for which a defendant is convicted may indeed violate the Eighth Amendment. In Lockyer v. Andrade, 538 U.S. 63 (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality review and held

1  that the only clearly established governing legal principle is that a "gross disproportionality" review

2  applies to criminal sentences for a term of years. Id. at 72. Citing extensively to its past cases

3  dealing with criminal sentencing and proportionality under the Eighth Amendment, the Court

4  acknowledged that it has "not established a clear and consistent path for courts to follow." Id. The

5  Supreme Court held that "the only relevant clearly established law amenable to the 'contrary to' or

6  'unreasonable application of' frame work is the gross disproportionality principle, the precise

7  contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Id.[4]

8       In Ewing v. California, 538 U.S. 11 (2003), the Supreme Court again reviewed the Supreme

9  Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view[5] that:

10      [There are] four principles of proportionality review-- the primacy of the legislature;
        the variety of legitimate penological schemes; the nature of our federal system; and,
11      the requirement that proportionality be guided by objective factors– that inform the
        final one: The Eighth Amendment does not require strict proportionality between the
12      crime and the sentence. Rather, it forbids only extreme sentences that are 'grossly
        disproportionate' to the crime.

13  Id. at 23.

14

15      In this case as previously stated, Petitioner participated in two drive-by shootings and was

16  convicted of first degree murder, two counts of attempted first degree murder, one count of

17  permitting another to shoot from a vehicle, one count of discharging a firearm from a vehicle, and

18  one count of shooting at an inhabited dwelling. He was a gang member and participated in the

19  crimes for the benefit of a criminal street gang. Given the facts of these very serious and heinous

20  offenses, Petitioner's sentence of life without possibility of parole was not grossly disproportionate

21  to his multiple offenses. The state court correctly applied clearly established Supreme Court

22  precedent, and the state court's conclusions were objectively reasonable.

23      It is clear that Petitioner has failed to demonstrate that the state court's decision was "contrary

24  to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

25  _____

26  [4] The Court recognizes that other Supreme Court cases have dealt with cruel and unusual punishment. See Solem
    v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263, 276 (1980). However, these cases analyze cruel and unusual

27  punishment in the context of recidivist statutes. In this case, Petitioner was sentenced for his current conviction.

28  [5] As expressed in his concurring opinion in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991), citing Solem v. Helm,
    463 U.S. 277, 288 (1983).

1   72, *quoting* 28 U.S.C. § 2254(d)(1). The petition should be denied.

2                        **RECOMMENDATION**

3          Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

4   PREJUDICE.

5          This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

6   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of

7   the Local Rules of Practice for the United States District Court, Eastern District of California.

8   Within thirty (30) days after service of the Findings and Recommendation, any party may file written

9   objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall

11  be served and filed within fourteen (14) days after service of the objections.  The Court will then

12  review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised

13  that failure to file objections within the specified time may waive the right to appeal the District

14  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

15

16

17  IT IS SO ORDERED.

18  **Dated:    August 23, 2011**                    **/s/ Sandra M. Snyder**
                                            UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28